## Case No. 3,456.

### The CRUSADER.

[1 Ware (437) 448.][1]

District Court, D. Maine. Nov. 14, 1837.

PROOF OF PARTNERSHIP BETWEEN MASTER AND MATE—SEAMAN'S CONTRACT—TERMINATION—DESERTION.

1. The allegation of a partnership between the master and mate of a vessel is not sustained by proof that the mate shipped for a share of the profits unattended by other circumstances, and without proof of what that share was to be.

[Cited in Joy v. Allen, Case No. 7,552; Grant v. Poillon, 20 How. (61 U. S.) 169.]

2. How far the sworn answer of the respondent may be referred to, as in the nature of suppletory proof, or in aid of presumptions raised by other proofs in the cause.

[Cited in Hutson v. Jordan, Case No. 6,959; The Eagle, Id. 4,233; The Australia, Id. 667.]

3. A general coasting and trading voyage in which the vessel is trading at ports in different states is within the act of congress of July 20, 1790 [1 Stat. 136], requiring the contract to be in writing.

[Cited in The Osceola, Case No. 10,602; Joy v. Allen, Id. 7,552; The John Martin, Id. 7,357; The City of Mexico, Id. 2,756.]

4. If a seaman is shipped for such a voyage by a verbal agreement, he is entitled under the statute to the highest rate of wages paid at the port where he shipped, and parol evidence is inadmissible to prove that a lower rate of wages, or a different mode of compensation was agreed upon.

[Cited in Packard v. The Louisa, Case No. 10,652; Duryea v. Elkins, Id. 4,197.]

5. If a seaman ships on a general trading or freighting voyage without any limitation of time or any fixed terminus of the voyage, either party, that is the master or the mariner, may put an end to the contract at pleasure, provided it is not done at a time, or under circumstances particularly inconvenient or injurious to the other party.

[Cited in Thompson v. The Oakland, Case No. 13,971; The Mary Ann, Case No. 9,194; Cox v. Murray, Id. 3,304; The Atlantic, Id. 620; Snow v. Wope, Id. 13,149; The Gem, Id. 5,304; The Pawashick, Id. 10,851; Worth v. The Lioness No. 2, 3 Fed. 925; Marsland v. The Yosemite, 18 Fed. 333; The Pacific, 23 Fed. 155.]

6. A mariner is not in such a case chargeable with desertion for quitting the ship without leave of the master, in a place where the master may easily obtain another man if wanted.

This was a suit for subtraction of wages by Charles Sweetsir, mate of the schooner Crusader. The libel alleges that he shipped as mate, at Portland, on the 15th of December, 1836, at the rate of twenty-five dollars per month wages, for a coasting voyage from Portland to Eastport, thence to New York,

[1] [Reported by Hon. Ashur Ware, District Judge.]

and thence to several ports in the southern states, enumerated in the libel, and thence to Boston, where he was discharged on the 7th of July, 1837, when there was due to him a balance of wages amounting to $141.-39, which was unpaid. The master in his answer admits that Sweetsir shipped as mate of the vessel for Eastport, that the schooner went from that port to New York, and thence to various ports in the southern states, but denies that there was any certain port of destination from Eastport, determined upon when they left Portland. He denies that any fixed rate of wages was agreed upon, and alleges that he had himself taken the vessel to employ her on shares, he to victual and man her, and pay to the owners for charter, or the hire of the vessel, two fifths of her gross earnings; that he agreed with Sweetsir to take him as mate, and to share with him the profits of the voyage; that is, the expenses of the vessel being first paid out of the three fifths of the gross receipts, the balance, or net profits, were to be divided equally between them. There is a further allegation, that the libellant did not faithfully perform his duty as mate, but was lazy, indolent, and grossly ignorant of his duty, and finally, that on their arrival at South Boston he deserted the schooner without leave. The master also alleged that while at New York he requested Sweetsir to sign the shipping articles, who refused to do so, assigning as a reason, that he and the captain being partners, there was no reason for his signing any papers, and that Sweetsir has already received more than his share of the profits of the several voyages, and that there is nothing due to him.

Fessenden & Deblois, for libellant.
Codman & Fox, for respondent.

WARE, District Judge. A preliminary question is raised by the pleadings in this case, and has been insisted upon at the argument, which goes to the jurisdiction of the court. It is admitted that Sweetsir, the libellant, was engaged and went in the vessel as mate, but it is contended that the contract which intervened between the parties was not a contract of hiring, but a contract of partnership, by which he and the master were to be equally interested in the profits and losses of the adventure. The agreement set forth in the answer was that Sweetsir should perform the duties of mate, and that "they should share the profits of the voyages as they should chance to be; that no fixed rate of wages was agreed upon; but that the expense of sailing the vessel being first paid out of the three fifths of the gross amount of the receipts, the balance was to be divided equally between them." If the respondent had intended to rely on the incompetence of the court to take cognizance of the matter, he should in correct pleading have specially excepted to the jurisdiction, and concluded with a prayer that the libel might be dismissed for this cause. This would have put the question of jurisdiction directly in issue. The rules of the admiralty do not demand all the technical formalities and exactness in pleading that are required by the common law, but the grounds of defence should be presented in the answer by clear and distinct averments, and when the respondent proposes to insist on several distinct and independent grounds of defence, they should not be embraced in a continuous statement or narrative, but each should be presented in a distinct and separate article. If, however, there be a defect in the pleadings, it is not too late to cure it by an amendment, provided the case made out in the proof sustains the objection.

If the contract between the parties were in truth a contract of partnership, it is not easily to be perceived how it can be brought within the cognizance of the admiralty. For though the admiralty has a general jurisdiction over maritime contracts and matters done on the seas, it does not follow that it has jurisdiction over all contracts leading to maritime adventures, and to employment on the high seas. If two persons engage as partners in maritime commerce, the contracts which they make with others for marine service, and other contracts in which the consideration is essentially maritime, as contracts of affreightment, or contracts with materialmen for the supplies or repair of the vessel, fall within the jurisdiction of the admiralty. But the contract of partnership between themselves, though it may exclusively have for its object maritime commerce, belongs ordinarily at least to another forum.

There is indeed a class of cases bearing an analogy to what this is contended to be, over which the admiralty holds an undisputed jurisdiction. I allude to fishing voyages in which it is common for the fishermen to be engaged for a share of the proceeds of the voyage, instead of wages at a fixed rate. Act Cong. June 19, 1813, c. 2, § 2 [3 Stat. 2]. This kind of engagement, does, indeed, constitute a species of imperfect partnership. 1 Valin, Comm. 676; Abb. Shipp. 442. The men become directly interested in the fruits of the adventure, and depend for their remuneration on its success. But the fishermen are not in such cases considered as partners with the owner in the proper sense of the word. The shares for which they contract are in the nature of wages, and an action of assumpsit lies at common law, or a libel may be brought in the admiralty for their share of the proceeds or profits of the adventure to be ascertained by a final settlement of the voyage. Wilkinson v. Frasier, 4 Esp. 182; Macomber v. Thompson [Case No. 8,919]; The Frederick, 5 C. Rob. Adm. 8.

Supposing, however, the question of jurisdiction to be put directly in issue by proper averments, how far will the proof sustain

the answer? The only evidence in the case relating to this point is derived from certain acknowledgments said to have been made by Sweetsir. Taking them in their utmost extent they amount to nothing more than that he engaged for a share of the profits. What that share was the evidence does not disclose. An agreement by seamen to receive as a compensation for their services a share of the freight or the profits of a voyage does not constitute them partners with the owners. An agreement between parties to share in certain proportions the profits of an adventure or enterprise, or of a particular kind of business, does not in the common transactions of business necessarily make them partners in relation to each other, not even under circumstances which may render them liable as such to third persons. Rice v. Austin, 17 Mass. 197; Waugh v. Carver, 2 H. Bl. 235; Colly. Partn. p. 44. A man may agree for a certain proportion of the profits as a compensation for his personal services, or in lieu of commissions or brokerage, without subjecting himself to the responsibility of a partner. Id. pp. 14, 15; 3 Kent, Comm. 25. The master, according to the statement in his answer in this case, took the vessel on an agreement to divide with the owners the gross earnings of the vessel in certain proportions. But this participation in the fruits of the voyage does not make them partners with him. The settled construction of such a contract is, that a share of the earnings is allowed as the hire of the vessel, in lieu of a fixed and certain sum as charter. Thompson v. Snow, 4 Greenl. 264.

If an agreement to receive as a compensation a share of the profits does not in the transaction of ordinary business necessarily create a partnership, there is less reason for allowing it to have, as a matter of necessity, that effect in contracts for maritime service, in which from the fact that in all times agreements of this kind have been more common and familiar, a partnership would be less easily presumed. The custom in the cod and whale fisheries to engage the fishermen for a share of the fruits of the voyage has been already mentioned. It is not unusual to engage seamen in freighting and trading voyages for a share of the freight, or profit. Such contracts are not only known with us, but are common in other maritime countries. The ordinance of the marine of Louis XIV. enumerates four modes in which mariners are engaged, that is, for wages by the month, or for the voyage; for a share of the freight, or profits. Liv. 3, tit. 4, art. 1. Valin in his Commentary, says, that in all times the engagement for a part of the freight has been customary (volume 1, p. 670); and it still continues to be a usual mode of hiring seamen in that country for coasting voyages (2 Boul. P. Dr. Mar. p. 170). In all maritime countries it is the ordinary mode in which seamen are

engaged for cruising in privateers, and from very early times, it appears from the old maritime ordinances that the engagement of mariners for a share of the freight was one of the most common forms of seamen's contracts. Jus Navale Rhodiorum, par. 2, cc. 1, 8, Edit. Pardessus; Jugemens d'Oleron, art. 16, and Cleirac on art. 8, note 34; Laws of Wisbuy, art. 30; Roccus, note 43. But it was never doubted that the contracts of seamen in all these cases were properly contracts of hiring and not of partnership. The share which they receive of the fruits of the adventure, to be ascertained at its final settlement, is in the nature of wages.

The naked fact alone, therefore, that the libellant engaged not for a fixed and certain rate of wages, but for a share of the profits, unconnected with other circumstances and without proof of what that share was to be, raises but a very slight presumption of a partnership between him and the captain. The answer, indeed, alleges that the share of the libellant was a moiety, and if it were in this particular supported by the evidence, the allowance of so large a portion of the profits would strengthen very much the presumption that the libellant engaged in the enterprise as a partner rather than on a contract of hiring. The testimony does not, however, in this particular support the answer. But as it is established by independent proofs that the libellant was to be compensated by a share of the profits, it may be contended that the answer should be received as in the nature of suppletory proof to show what that share was. It is admitted that the sworn answer of the respondent stating in detail and with exactness the matters of defence, though not evidence in the strict sense of the word, may be referred to, to explain ambiguities in the testimony and, in aid of presumptions arising from the evidence, to supply connecting links in the proof; and that it is ordinarily entitled to more consideration than the naked statement of a party unsupported by his oath. But the degree of credit allowed to an answer in this respect must depend on the apparent good faith with which it is made.. The credit of an answer in the admiralty is not measured by any technical rule, as it is in equity. And as it derives its credit from the good faith of the respondent, we may look for the evidence of that good faith, not only to the answer itself but to all the facts in the cause bearing on that question. Now there is one fact in proof drawn from the examination, on the stand, of a witness, whose deposition the master himself offered in the cause, which does most clearly and directly impeach the good faith and integrity of the respondent. It is proved by this witness that the master, after the termination of the enterprise, deliberately altered the entries in the books in which he kept an account of the receipts and disbursements of the vessel, for the avowed purpose of ex-

hibiting a less amount of profit, and thus defrauding the libellant of a part of what, upon the very case he has made in his answer, would be justly his due. A fact of this. kind being established is quite enough to destroy all credit which might be claimed for the answer. Upon the whole case I think that the allegation of a partnership is not made out by the proofs.

Assuming that the contract in this case is a contract of hiring and not of partnership, the parties are at issue with respect to i.s terms, the libellant alleging that he shipped for wages at the rate of twenty-five dollars a month, and the respondent that he shipped for a share of the profits. There was no contract in writing, nor is it certain that there was any shipping paper on board the vessel when she left Portland. Notice was given to the master to produce it, and one is put into the case, but it is dated at New York, and bears the names of only two men, who were shipped at that place in the month of April. Some of the witnesses say that during the latter part of the time, there were three or four shipping papers on board, but it does not appear when or by whom they were signed. It is not pretended that any one was signed by the libellant.

There having been no contract in writing, it is contended by the counsel for the libellant that the master is precluded by the act of congress of July 20, 1790, c. 56, § 1, from proving the terms of the contract by parol evidence. That act provides that "every master of a vessel bound from a port in the United States to any foreign port, or of any vessel of the burden of fifty tons and upwards bound from a port in one state to a port in any other than an adjoining state, shall before he proceeds to sea make an agreement in writing or in print with every seaman or mariner on board (except his own or the owner's apprentices) declaring the voyage or voyages, term or terms of time for which such mariners are shipped." If he fails to do it, he shall pay, to every mariner shipped without signing such an agreement, the highest price or wages which shall have been given, for a similar voyage, at the port where he was shipped within three months next before the time of shipping, for the whole period of the voyage, or for such time as the mariner shall have served, and shall in addition be liable to a penalty of twenty dollars, and the seaman shall not be bound by the regulations nor subject to the penalties of the act.

There does not appear to have been any shipping paper at the commencement of the engagement, describing the voyage or voyages upon which the vessel sailed; but it is sufficiently apparent and is admitted that the engagement was for a general coasting and trading voyage, the original intention having been to go first to Eastport, thence directly or through some intermediate port to New York, and thence to engage in a series of coasting voyages to various ports in the southern states. The contemplated voyages and those for which the libellant shipped are clearly within the words of the statute, and its language is express that if there is no written contract the highest wages shall be paid. For what purpose, then, can evidence be offered of a parol agreement for a different rate of wages, when the law dictates the judgment of the court? It is difficult to imagine what form of words the legislature could have chosen more effectually to exclude the admissibility of a parol contract to control the operation of the law. The statute not only declares that the highest rate of wages shall be paid, but imposes a personal penalty on the master for neglecting to comply with its injunctions. Nor can the construction of this section be affected by the provisions of the eighth section which will undoubtedly, in the case provided for, let in parol proof. By that section the master is required in a suit by the seamen for their wages "to produce the contract and log-book to ascertain any matters in dispute, otherwise the complainants shall be permitted to state the contents, and the proof of the contrary shall lie on the master." But this is in a case where there has been a written contract, and upon common principles, when it is lost or has been destroyed by accident, the parties are admitted to give secondary evidence of its contents. The first section contemplates a case where there has been no written contract. The language appears as clear and explicit as it can well be, and where the intention of the legislature admits of no doubt, the only duty the court has to perform is to carry that intention into effect.

The counsel for the respondent referred to a note in 1 Pet. Adm. 213 [Jameson v. The Regulus, Case No. 7,198], in which that learned judge states it as his opinion that an agreement although verbal supersedes this provision of the statute. No case is referred to, where this has been decided. The note is quoted in the American edition of Abbott on Shipping (page 434, note), where the learned editor expresses in very pointed terms his doubts as to the correctness of this opinion. "Before such a decision should be made it would require very grave consideration how far such a verbal agreement, in contravention of the statute, should be admitted to supersede the positive direction of the statute as to the highest wages." The language of the statute appears to me to be too clear and unequivocal to be made to yield to the supposed equity of particular cases; and in my judgment it is as wise in its policy as it is clear in its meaning. There are few contracts in the ordinary business of life which it is more important should be plain and certain, and from which it is more desirable to exclude the uncertainties of parol proof, than those of seamen. Mariners, as a class, though in some respects sufficiently tenacious of their rights, are habitually and proverbially careless, rash,

and improvident, variable in their temper, and peculiarly liable to be imposed upon and overreached by practising on their characteristic weaknesses, and, for that reason, perhaps quite as accessible as others to suspicions of unfair dealing. All maritime nations have felt the importance of giving to these contracts the greatest degree of certainty, and it may, I think, be said that the maritime law, as a general principle, requires them in ordinary cases to be evidenced by writing. The law of England does not declare a verbal contract absolutely void, but it imposes a penalty on the master for not reducing it to writing. Abb. Shipp. 440. The law of France requires also the contract to be in writing. It does not subject the master to a penalty for not putting it into writing, but the established rule of jurisprudence is, that if there be no written contract the terms of a verbal agreement cannot be proved by parol testimony, preuves par temoins, but they are determined by the usage, or what is customary in the place where it was made. Ordinance de la Marine, liv. 3, tit. 4, art. 1; Code de Commerce, No. 250; 1 Valin, Comm 676, 677; Poth. Contracts Maritimes, No. 167; 2 Boul. P. Dr. Mar. p. 168. Our statute combines the principles of both the English and French law. It subjects the master to a penalty for shipping a seaman without a contract in writing, and determines the rate of wages when the contract is verbal. But if a mariner ships by a verbal contract for a share of the freight or profit, it may be a question whether or not the highest rate of remuneration under a contract in that form is not to be taken. My opinion is that the law does not intend to regard these distinctions, but the usual form of the contract being for a certain rate of wages in money, this must be the rule of decision in all cases.

Another point insisted on in the defence is, that the libellant was ignorant and negligent of his duties, and finally that he forfeited by desertion whatever wages he might otherwise have claimed. With respect to the allegation of incapacity and negligence, it is unnecessary to inquire how far these can be relied upon as a ground for allowing a diminished compensation in a case where the rate of wages is determined, not by the agreement of the parties but by the statute, because the allegation is not, in my opinion, satisfactorily made out by the proof. But the alleged desertion involves a question of some difficulty. The counsel for the libellant contended that as there was no contract in writing there can be no forfeiture for desertion, the statute expressly declaring that the seamen who have signed no agreement in writing, "shall not be bound by the regulations nor subject to the penalties or forfeitures contained in the act." But it is very clear and well settled that the statute does not repeal the general maritime law in cases which are not within the purview of the act. The Regulus [supra]; Cloutman v. Tomison [Case No. 2,907]. The libellant would not forfeit his wages by the statute desertion of absence for more than forty-eight hours without leave, nor is he subject to any of the penalties and forfeitures specifically provided by the act. But in all matters not within the scope of the statute, the general, maritime law is left in all its efficiency. The unarticled seaman not being within the act, his rights and obligations are to be determined by the general law. They are precisely what they were before the act was passed. But by the general law, independent of any statute regulation, desertion works a forfeiture of all wages antecedently earned. Abb. Shipp. 463–468, and note to page 464; 1 Valin, Comm. 535; Consulat de la Mer. cc. 157, 158–268; Cleirac, Jurisdiction de la Marine, art. 60, note 3.

Was there then a desertion? It is proved and admitted that Sweetsir left the vessel at Boston without the consent of the master, and did not return to her. Desertion in the sense of the marine law is absconding, or abandoning a vessel by a seaman with the intention of not returning. But it must be an abandonment in violation of his contract and while he was under an obligation to remain. That Sweetsir left the vessel without the knowledge or permission of the master, and that when he left, his intention was not to return, is apparent from the evidence, and is not denied. The only question then is, whether he was bound by his contract to remain, and it is one not free from difficulty. In the libel Boston is described as the terminus of the voyage, and this is contradicted by the answer, rather by way of inference than by a direct denial. As there was no shipping paper at the commencement of the voyage, or at least none that has been produced, we are left to ascertain what the intended voyage was, from the testimony of the witnesses. From this it appears that the voyage for which the libellant shipped was a general trading and freighting voyage, without any particular designation of the ports to be visited, without any certain terminus of the voyage, and without any limitation of the time for which the engagement was made. Is such an indefinite and unlimited engagement valid and binding on the parties? And if so, how far? Society may condemn a man to perpetual servitude, as a punishment for his crimes. But I take it to be perfectly clear that a man cannot bind himself to a perpetuity of service, or servitude for life by his own voluntary act. The policy of the law will not admit of such a contract. Though it may be valid to determine the rights and obligations of the parties while both choose to adhere to it, in its nature it is liable to be dissolved at the pleasure of either party. And if a contract is made for personal service without any limitation of time, which may be

prolonged indefinitely, the law will either affix to it a reasonable limitation or provide some mode by which a limit may be put to it. This cannot be by mutual consent only, the ordinary mode in which contracts are dissolved, for then it would be in the power of either party to render it perpetual. Such a contract must be liable to be dissolved by either party at his pleasure, subject to the equitable restriction that this shall not be done under circumstances, or at a time particularly inconvenient or injurious to the other party. See 19 Droit Civile Francais, Continuation of Toullier (by Duvergier), Nos. 284, 288.

If these principles are correct, their application to the case is obvious. When a seaman ships on a general trading and freighting voyage without any limitation of time, and without any certain destination or fixed terminus of the voyage, and which may at the pleasure of the master be prolonged indefinitely, the legal construction of the agreement is, that it is a contract which may be terminated at the will of either party. The master has, at least, the power of putting an end to it at any time, by putting an end to the voyage. And it is the dictate of common sense and common justice that the mariner should have the same right of dissolving the contract, by leaving the vessel at any time when this will not be productive of special injury to the master. Such, it appears to me, must have been the construction if the agreement had been in writing, the statute requiring that the "voyage or voyages, term or terms of time" shall be stated in the contract. It will not admit an indefinite agreement for service without limitation. The master appears to have been fully sensible of it, for in the shipping paper dated at New York, the only one produced of the three or four said to have been on board during the period of the libellant's service, the voyage is described as from New York to some port in North Carolina, and thence back to New York, to be employed in the coasting trade for the term of three months, unless sooner discharged as the master shall see fit.

Allowing that the libellant was not bound by his contract to remain in the vessel as long as the master choose to employ him, but that he might at any suitable and convenient time put an end to it by his own act, it is not pretended that any inconvenience resulted to the master by his leaving the vessel at Boston. She was on her return and within one day's sail of her home port, and it does not appear that it was even necessary to supply his place by another hand. Upon the whole, my opinion is, that there has been no desertion within the meaning of the law, and I therefore pronounce for the wages, deducting all payments which have been made in the course of the voyage.

Wages decreed for six months and twenty-three days.