## MARSLAND and others *v.* THE YOSEMITE.

(*District Court, S. D. New York.* October 31, 1883

**1. PLEASURE YACHTS—SHIPPING ARTICLES.**

Seamen shipping on a pleasure yacht and signing shipping articles can only be discharged in conformity with the ordinary maritime law, which does not justify a discharge for single acts of negligent disobedience.

**2. SAME—NOTICE.**

Where shipping articles did not provide for any definite voyage, but for service not exceeding six months, payable monthly, *held,* while the vessel was in her home port and no voyage determined on, the service was terminable by either party at the end of the month on reasonable notice.

**3. SAME—DISCHARGE—WAGES.**

The chief engineer being discharged in the middle of the month, without sufficient cause under the maritime law, would be entitled to one month's wages.

**4. SAME—DISOBEDIENCE.**

Where the first engineer, immediately upon his discharge, drew the fires of the engine on a cold winter's day, thus imperiling the ship, contrary to the orders of the master and owner, and abetted all the rest of the engineer's department in leaving the ship contrary to orders, *held,* that by these acts he forfeited all claim to the residue of the month's wages which would otherwise have been awarded him.

**5. SAME—CUSTOM.**

An alleged custom for the rest of the men in the engineer's department to leave if the engineer is discharged, *held* illegal.

In Admiralty.

*Beebe, Wilcox & Hobbs,* for libelants.

*Benedict, Taft & Benedict,* for claimant.

BROWN, J. This action was brought by the chief engineer, and the first and second assistant engineers, of the steam-yacht Yosemite, to recover six months' pay. They signed shipping articles on February 1st, and entered upon their duties thereunder on that day, and were discharged on the 12th, by the owner, on the ground of disobedience of his orders. The Yosemite was a pleasure yacht, which was expected during the season ensuing to make a race across the Atlantic. She was at this time fitting out for the expected voyage. The owner's attention being directed to the soiled appearance of the ventilators, which projected some eight feet above the deck, about noon of the eleventh of February he directed the chief engineer to have them cleaned bright, which the engineer promised to do. About 4 P. M. of the following day, the owner, upon boarding the vessel and finding no one at work upon them, and very little having been done to them, called the first engineer, and being dissatisfied with his excuses and his manner, discharged him at once. He then sent for the first assistant engineer and directed him to take charge of the engine, which the assistant refused to do. He was thereupon discharged. The owner then sent for the second assistant, and asked him in like manner to take charge of the engine. He also refused, and was likewise at once discharged. The first engineer, on being discharged, went below and

directed the fires to be drawn, which was done; and within half an hour all the men belonging to the engineer's department left the ship, including the oilers and firemen. On the Monday or Tuesday following, the chief engineer returned and proffered the services of himself and all the men in his department who had previously left. They were not accepted. The wages of the three engineers up to the time they were discharged were at that time, tendered by the master in a check, on giving a receipt in full, which was refused by the libelant on the ground that he was entitled to wages up to that day. The owner testified that, several times previous to the discharge of the first engineer, he had called his attention to the ventilators, and directed them to be cleaned, and that the engineer had repeatedly delayed by excuses which seemed to him mere evasions. The first engineer testified that the first that was said to him about cleaning the ventilators was at 4 P. M. on the day previous; that he then at once set his men to work getting ready to clean them, and that a beginning was made that afternoon; that the following day was too stormy to work; and that, although it cleared up in the afternoon, he was at work below and had not observed that the weather was suitable, so as to put men upon the job again in the afternoon before the owner called. He also testified that this work did not belong to his department, but to the deck hands. He did not make this objection, however, when directed to clean the ventilators, but promised to clean them; and it appears that these ventilators were specially for the benefit of the rooms of the engineer's department below, and that it had been customary on this vessel for the men of that department to attend to them.

Taking all the evidence together, I am satisfied that there was no predetermined intent by the chief engineer to disobey or evade the owner's orders to clean the ventilators. I am inclined to think the owner mistaken in supposing that he had ordered them cleaned before Friday. But the chief engineer is shown to be guilty of plain neglect of orders in doing no cleaning on Saturday, after 1 o'clock, when the weather became suitable; and the owner, on arriving at 4 and finding substantially nothing done, was justly incensed, and his displeasure was naturally increased by the plainly insufficient excuses offered. At the bottom of the chief engineer's neglect was doubtless his misapprehension of the duties of his department in regard to cleaning the ventilators; to which the receipt of orders through the owner instead of through the master, who was all the time on board, and also a want, possibly, of a full appreciation of the requirements of that scrupulous nicety which is proper and requisite in all the appointments of a pleasure yacht, may have contributed. But these considerations are but palliatives, and no justification, of his neglect. Judged by the rules pertaining to service on land, the owner might have legally discharged him, but not by the rules and usages of the sea, to which both parties, by the nature of the serv-

ice ana the signing of shipping articles, had become amenable. Up to the time of his discharge, the chief engineer's conduct, though negligent and blamable, had not been, in my judgment, either malicious or flagrant, nor in any way endangering the safety or discipline of the ship; and when discharged, though excited, his manner to the owner—says the captain—was neither insolent nor disrespectful. In such cases, by the maritime law, single acts of negligent disobedience of orders are not sufficient to justify a seaman's discharge. There must be repeated acts of this character, with still a *locus penitentiæ*, before a complete discharge from the voyage or shipping contract will be sustained. Curt. Seamen, 148–150. And although the particular duties required of seamen upon a pleasure yacht will doubtless differ from those required on ordinary steamers, just as the duties of seamen on board of steamers are different from those on ordinary sailing vessels, yet the general principles applicable in a court of admiralty to the discipline and discharge of the men who ship on board under shipping articles must be the same in all. If the exigencies of the yatching service require more arbitrary powers in the owner or master, these powers must be stipulated for in the articles, and be brought home to the express knowledge of the seamen.

In this case the shipping articles did not provide for any definite voyage, but only for general service "not exceeding six months," payable monthly. Under such a contract, so long as no definite voyage is entered upon or agreed to by some further understanding of the parties, and while the vessel is remaining in the home port, as in this case, I think either party at liberty to terminate the service at the end of any month, on reasonable notice. *The Crusader*, 1 Ware, 448. In this view the chief engineer would have been entitled to one month's wages, except for the subsequent occurrences to which I shall presently refer.

The refusal of the first and second assistant engineers, respectively, to take charge of the engine, when requested to do so, upon the discharge of the chief engineer, was immediate and direct, without any excuse at the time, and without any justification or palliation shown on the trial. The testimony of the first assistant, that he had no license as chief engineer, and that he did not think himself capable of taking sole charge for a racing voyage to Europe, is not pertinent. The circumstances did not indicate that he was directed or expected to become chief engineer, but only to assume temporary charge until the engineer's place could be supplied; and this involved no more responsibility than the ordinary duties which he had been accustomed to perform. The same is true of the second assistant. In the cold weather then prevailing it was necessary to the safety of the ship to maintain the fires in the engines and have some one to take charge of them. The refusal to do this was after it was known that the chief engineer had been discharged; and the assistants immediately pro-

ceeded with the chief engineer to draw the fires, though forbidden by the master to do so; and all the men in the engineer's department shortly after left the ship with jeers, though forbidden to leave. There can be no doubt that all the men in the engineer's department, from the chief engineer down, after the discharge of the latter, were acting in concert. Not only did every one refuse duty, or leave contrary to orders, but the chief engineer, on the Tuesday following, proffered the services of all in a body; and on the trial evidence was offered of a custom for the men to be engaged and to leave with the chief engineer. The evidence and the custom were ruled out as incompatible with the shipping articles and with the discipline of the ship. It is evident that a word from the chief engineer would have prevented the departure of all the rest of the men, which was semi-mutinous in character, and would have been prevented by force had the ship not been moored to the wharf. I cannot resist the conviction that the drawing of the fires contrary to the master's orders, the refusal of the first and second assistant engineers to attend to the engines, and the departure of all the men in the department against the master's protest, was a concerted movement, which, if not directly instigated by the chief engineer, had his sanction and support, and which, under the circumstances, must be mainly chargeable upon him, since a word from him would have prevented it. The chief engineer's act of drawing the fires late on Saturday afternoon of a cold winter's day, and in effect abetting the departure of the first and second assistants, which furnished the only plausible reason for drawing the fires, were acts imperiling the safety of the vessel; and for these acts, clearly malicious, in which the first and second assistants concurred, they must all be held, in a court of admiralty, to have forfeited the residue of the month's pay to which they would otherwise have been entitled.

The amounts tendered in the answer will be decreed, but without costs since that time.