**Fred STETSON, Debbie Stetson, Plaintiffs,**

**v.**

**S/V SEA CLOUD, O.N. 679463, Her Engines, Tackle, etc., Defendant in rem.**

Civ. A. No. 85–2584–Y.

United States District Court, D. Massachusetts.

Jan. 30, 1987.

Leonard Rose, Falmouth, Mass., for plaintiffs.

Edwin L. Wallace, Latti Associates, Boston, Mass., for defendant.

**MEMORANDUM OF DECISION**

YOUNG, District Judge.

This action for seamen's wages arises under the admiralty and maritime jurisdiction of this Court. In it, the plaintiffs, Fred and Debbie Stetson, husband and wife, seek damages allegedly due them under a certain maritime contract including salary due, unreimbursed out-of-pocket expenses, the monetary value of certain room and board which they claim due them, and punitive damages and attorney's fees for the alleged "wrongful, malicious, wanton and reckless, unconscionable and callously indifferent" conduct of the defendant vessel's owners.[1] Upon the merits, the action turns on the issue whether Fred and Debbie Stetson were properly discharged as master and cook aboard the SEA CLOUD in violation of their contract with her owners and, if so, whether they acted reasonably to mitigate their damages.

In 1984, Fred and Debbie Stetson and their baby son were living aboard the sloop[2] FANTASY, a Gulfstar 43, anchored in Long Bay, St. Thomas, Virgin Islands. Fred Stetson, who had taken courses at Massasoit Community College and the Massachusetts Maritime Academy, was operating the FANTASY as a charter boat with himself as master and his wife as cook. While there, Fred Stetson met John Kunkel at Frenchman's Reef. Kunkel was by profession an airline pilot but he had served as a second class petty officer in the Navy and, during his free time, invested in and managed various yachts in the charter boat

---

[1] In his papers, the Stetsons' legal counsel also makes mention of a claim pursuant to Mass. Gen. Laws ch. 93A. The claim has never ripened into a specific complaint, brief, or argument and the Court deems it waived. If not waived, it is frivolous since Mass. Gen. Laws ch. 93A has no applicability to the employer—employee relationship. *Manning v. Zuckerman,* 388 Mass. 8, 444 N.E.2d 1262 (1983); *Weeks v. Harbor National Bank,* 388 Mass. 141, 144, 445 N.E.2d 605 (1983); *see Riseman v. Orion Research Inc.,* 394 Mass. 311, 475 N.E.2d 398 (1985) (a stockholder's claim of deceptive proxy solicitations by company not trade or commerce under Mass. Gen. Laws ch. 93A, § 2); *Energy Resources Corporation, Inc. v. Porter,* 14 Mass. App.Ct. 296, 303, 438 N.E.2d 391 (1982) (suit by corporation against its officer not actionable under Mass. Gen. Laws ch. 93A, § 11); *Newton v. Moffie,* 13 Mass.App.Ct. 462, 434 N.E.2d 656 (1982) (private dispute between partners not actionable under Mass. Gen. Laws ch. 93A, § 11); *see also* M. West & H. Weissblum, *"M.G.L. Chapter 93A—The Consumer and Businessman's Protection Act", The Preparation and Trial of a Chapter 93A Case—An Update* 73 (Massachusetts Academy of Trial Attorneys, Inc. 1986).

[2] This is an inference drawn by the Court in as much as a Gulfstar 43 is normally sloop rigged although a small mizzenmast can be stepped as an option to make such a vessel a yawl.

trade through a corporation called Pilot Marine Services, Inc. Kunkel told Fred Stetson that he was in the process of bringing new "ninety footers" to the Virgin Islands and was looking for charter boat captains for these vessels. Fred Stetson asked to skipper one of these vessels and said that his wife would serve as cook. He volunteered that he had been in the charter boat business for three years and had handled over one hundred charters in addition to earlier having served as a member of the crew aboard the forty-two foot HAMER-JAN. He said that the United States Coast Guard had licensed him as a charter boat captain. Fred Stetson was, in fact, licensed by the United States Coast Guard but, pursuant to 46 C.F.R. subpart 10.20, his license authorized him only to operate powered vessels carrying six passengers or less. Fred Stetson was not trying to deceive Kunkel—indeed, he later forwarded a copy of his license to Pilot Marine's insuror as requested—but Kunkel, a relative amateur despite his rather grandiose plans, inquired no further on this point. In fact, the vessels for which Kunkel was seeking captains and crews could sleep more than six passengers and Kunkel expected to charter larger numbers to make the venture profitable. The two then parted, each believing that the interview had gone well and each impressed with the other.

Kunkel and Fred Stetson talked further concerning possible employment by telephone and Fred Stetson assured Kunkel that he could find a nurse to stay with his son during any charter voyage. In a second telephone call, Kunkel assured Stetson that he was hired and would have a "one year contract—standard in the business." Fred Stetson asked for a written contract and a letter agreement dated September 21, 1984 followed. It was addressed to "Dear Fred and Debbie" from Douglas E.

Cloud who claimed to be writing "on behalf of John Kunkel and Pilot Marine Services." The letter agreement provided for an annual base salary of $32,000 for both "you and your wife" plus a percentage commission based upon the number of charters and the charter rate for each charter party. The letter agreement mentioned nothing whatever concerning the Stetsons' responsibilities save that it contemplated the specified compensation in return for Fred Stetson "accepting the position of captain of our yacht." The Stetsons received the proposed letter agreement on September 29, 1984, talked it over, and on October 18, 1984, Fred Stetson executed the letter agreement on the line denominated "accepted and agreed for Captain Stetson." [3]

In November, 1984, the Stetsons flew to Massachusetts, delivering a car from there to Venice, Florida and arriving on November 27th. Fred Stetson contacted Kunkel and entered the service of Pilot Marine Services, Inc. at the beginning of December, 1984. His first job was working in the shipyard on the commissioning of the CHINA CLOUD.

On December 5, 1984, he commenced working on the defendant SEA CLOUD. The SEA CLOUD had recently been constructed in Taipei, Republic of China, and when Fred Stetson first saw her, she had no masts, no generator, and no refrigerator. Known as a "Clipper 90" the SEA CLOUD measures sixty-eight feet on the main deck (exclusive of bowsprit) and fifty-eight feet at the water line. Fred Stetson participated in finishing the interior of the SEA CLOUD and rigging her as a schooner.[4] At this time the vessel was not yet documented, although documentation had been applied for. Documentation was ultimately issued on August 20, 1985 specifying that the SEA CLOUD was documented as a pleasure vessel and for registry to

3. While the complaint refers to the male plaintiff as "Capt. Fred Stetson," the signature on the letter agreement reads "Frederick S. Stetson." There is no dispute but that the letter agreement was validly executed and that the plaintiff and the signatory to the agreement are one and the same.

4. The Schooner SEA CLOUD, defendant in this action, is not to be confused with the magnificent three hundred sixteen foot, four masted bark SEA CLOUD, presently in charter service. The larger SEA CLOUD was launched in 1931 for Mrs. Marjorie Post Hutton and contained one of the original Sperry gyroscope ship stabilizers. J. Rousmaniere, *The Luxury Yachts* 148–149, 166 (1981).

engage in foreign trade under the laws of the United States.[5]

Fred Stetson had supposed that the SEA CLOUD was owned by Pilot Marine Services, Inc. This was not, in fact, the case. Rather, Pilot Marine Services, Inc. acted as a ship brokerage and charter coordinator. The SEA CLOUD itself was sold to four investors, including Kunkel, who had formed a Sub-chapter S corporation, Sea Cloud, Inc., to own the vessel. Ownership by this Sub-chapter S corporation maximized the tax advantages to these investors. In Kunkel's words, they could obtain an investment credit, write off the expenses of managing the vessel, depreciate it over time, and obtain capital gains treatment for any profits upon a sale after a five-year holding period. Kunkel had represented to his other investors that the SEA CLOUD would operate predominently in United States waters.[6]

From the guest log, the Court infers that the SEA CLOUD set sail from Florida to the United States Virgin Islands on or about January 14, 1985, arriving at St. Thomas on or about January 21, 1985.

In the three months which followed, the SEA CLOUD made seven voyages as well as two day sail trips for wedding parties. Throughout this period, Fred Stetson acted as captain and Debbie Stetson acted as cook aboard the vessel. Although certain guests enthused—"Supreme relaxation and perfect ambiance!," "Wonderful weather, sailing, food, and fun," "Blue skies, full glasses and lots of lovely little lassies,"— the SEA CLOUD and the parties herein did not sail off into the Caribbean sunset.

On the Stetsons part, the SEA CLOUD, as a vessel on her maiden voyage, needed myriad items not already fitted. Specifically, she needed a spare suit of sails, a windlass, a full electronics rig, and things as mundane as rope for life lines. Unfortunately, contrary to Stetson's expectations, Pilot Marine Services, Inc. never established any bank accounts in the United States Virgin Islands for the operation of their vessels and the Stetsons accordingly had to operate the SEA CLOUD's charter business through the account already established for the FANTASY. Indeed, in May and June, 1985, when receipts from charter operations had trailed off with the end of the winter vacation season, the Stetsons found themselves using their own salary to carry the vessel. In addition, the vessel's auxiliary power steering system needed to be bled more frequently than Fred Stetson thought appropriate and the head in the crew's quarters was inoperable. What's more, five out of the seven charters exceeded six passengers and, in addition to the resulting cramped quarters, Fred Stetson must have known that he was violating his Coast Guard license in carrying so many people.[7] Indeed, on one day sail, the Stetsons put to sea with "a celebrating party of thirty three people from New Orleans."

Nor was Kunkel satisfied with the skipper and cook aboard the SEA CLOUD. Unlike the glowing reports found in the guest log maintained by the Stetsons aboard the SEA CLOUD (which log, it may be inferred, the guests well knew the Stetsons would review), Kunkel was receiving other, less enthusiastic reports from Virgin Islands Water Safaris, the charter brokerage with which he dealt to arrange charter passengers for the SEA CLOUD and his other vessels. These reports reflected

---

5. For an excellent description of United States vessel documentation procedures, see C. Chapman, *Piloting, Seamanship & Small Boat Handling* 47–50 (56th ed. 1983).

6. Interestingly, despite the representation made to investors and the tax advantages Kunkel sought to derive from ownership by the Sub-chapter S corporation of the SEA CLOUD, Pilot Marine Services, Inc. never deducted any withholding taxes from its employees aboard the SEA CLOUD, ostensibly for the reason (so Kunkel testified) that the vessel spent most of its time cruising out of United States territorial waters in the British Virgin Islands. This seems too clever by half. Accordingly, the Clerk is directed to send a certified copy of this opinion to the United States Internal Revenue Service for such review and investigation as it may deem proper.

7. The Clerk is instructed to send a certified copy of this opinion to the United States Coast Guard for such review and investigation of this matter as it deems appropriate.

some dissatisfaction with the Stetsons. Debbie Stetson was referred to on different charter voyages by more than one passenger as "aloof." Passengers resented her keeping the galley "off limits" and expressed concern over feeling that they were intruding aboard the Stetsons' "home." A family who had trouble operating the head also complained that Fred and Debbie Stetson fought among themselves. Another vacationer noted that the Stetsons were "obviously uncomfortable with [the] number of passengers."

Further, during the twenty hours immediately prior to taking on passengers for one charter, Fred Stetson was nowhere to be found. The SEA CLOUD was then lying in Charlotte Amalie, St. Thomas, United States Virgin Islands, and the director of operations for Pilot Marine Services, Inc. and a crew member of the SEA CLOUD "combed the town," searching for him. The next morning he turned up, haggard and tired, rather lamely explaining that he had met up with some Navy friends, gone to a party, and been unable to get a taxi to return. Thus, he said, he "had to walk back over the mountain" to rejoin the vessel.

In early April, 1985, Kunkel met with the Stetsons in the Virgin Islands to discuss passenger complaints and the matter of Fred Stetson's disappearance prior to a cruise. At the time of the meeting, Kunkel noted that the Stetson's young son was aboard the vessel in contravention of their earlier understanding that the child would be boarded during each cruise. Fred Stetson apologized, saying that he ought have obtained permission before bringing his son aboard the SEA CLOUD. Kunkel also ordered the Stetsons to remove the ship's cat from the vessel since he had received a complaint that the cat was defecating in the food handling spaces.

In late May, Fred Stetson was directed by Kunkel to sail the SEA CLOUD to Falmouth, Massachusetts, from which port she could be moved to Boston to act as a support ship for a boat show in which other Pilot Marine Services, Inc. vessels were on display as charter cruise ships. Fred Stetson specifically received permission to bring his son along on this voyage and, with both wife and son aboard as well as an augmented crew for ocean sailing, he left the United States Virgin Islands bound for Bermuda. On June 10, 1985, the SEA CLOUD cleared Bermuda bound for New England and on June 15, 1985, Fred Stetson brought the SEA CLOUD into Falmouth Harbor, berthing her at Falmouth Marine Yard.

With the vessel in Falmouth, Kunkel felt he had little further need for the Stetsons. He believed that, as the SEA CLOUD was in the near term to be used as a store ship for other vessels on display, he could man and operate her with the personnel of those other vessels. Moreover, the season for active charter cruising was now past and economically, in view of the lack of prospects of further charter cruises, he recognized that Fred and Debbie Stetson had become a drain on the cash flow of Pilot Marine Services, Inc. With these thoughts in mind, Kunkel subjected the SEA CLOUD to an unannounced inspection on June 17, 1985. Not surprisingly, he found things not to his liking. He considered the maintenance substandard, the record and log keeping inadequate, and the ship's cat was still aboard in contravention of Kunkel's direct command to discharge him. Fortified by these findings, Kunkel discharged the Stetsons forthwith. In the exit interview, he candidly admitted the part that economic considerations played in the decision to, as he put it, "part company."

The findings just made capture, as best this Court can, the reality of what actually happened. At trial, the perceived imperatives of the adversary system unfortunately drove the parties into considerably more extreme positions.[8] The defense attempted

---

**8.** This case is a prime example of a pervasive concern with our adversary system of justice. *See generally* M. Rosenberg, The Adversary System and Dispute Processing in Our Society: Fine Tuning or Wholesale Revision 13 (October 14–16, 1982) (paper delivered at the National Conference on The Lawyer's Changing Role in Resolving Disputes, Harvard Law School) ("[Some] argue that an adversarial confrontation between parties is bound to magnify their

to paint Fred Stetson as a captain having the vacillation of Admirals Byng[9] or Parker,[10] the hauteur of Captain Bligh,[11] and the paranoia of Captain Queeg,[12] not to mention the technical incompetence of Admiral Cordova off Cape St. Vincent.[13] For his part, Fred Stetson claims that he had no obligation whatsoever for the maintenance of the vessel under his contract. None of this will wash.

■ Whatever the problems with Fred Stetson's attitude, as matter of actual fact this Court finds they played little or no role in his firing since he was retained as skipper of the SEA CLOUD during the period April–June, 1985, after these alleged problems were well know to Kunkel. Likewise, the problems with technical competence, i.e., record keeping and maintenance, were, this Court finds, minimal. They could not properly form the basis of discharging Fred Stetson unless and until adequate policies and procedures had been spelled out with more particularity than was the case here and those policies and procedures called to Fred Stetson's attention. The Court finds that the problems unearthed by the successor captain were due in large measure to the inadequate attention the SEA CLOUD received following the discharge of the Stetsons and prior to the successor captain coming aboard.

■ Equally silly and unworthy of Captain Stetson is the contention that he had no duties at all with respect to maintenance. This is expressly contradicted by paragraph four of the procedures memorandum distributed by Kunkel on January 24, 1985 and received by Fred Stetson sometime in February of that year. Even without this procedures memorandum, it is the essence of a captain's duties to keep his vessel constantly in the highest state of readiness and trim. The point is not that Fred Stetson had no duties in this regard but rather that the state of maintenance of the SEA CLOUD, even if not up to the highest possible standard, was not the motivating force which led to the dismissal.

■ Clearly, "the law of the sea is obedience. Disobedience of a master's reasonable orders constitutes just cause for discharge." *Davis v. Delta Steamship Co.*, 704 F.2d 762, 763 (5th Cir.1983) (citing 1B, Benedict on Admiralty § 65, at 5–17 [7th ed. 1982]). Even so, admiralty courts do not sanction a discharge for trivial reasons. *Forster v. Oro Navigation Co.*, 128 F.Supp. 113, 118 (S.D.N.Y.1954), *aff'd*, 228 F.2d 319 (2d Cir.1955). The causes which justify a discharge of a seaman before the termination of his or her contract are generally such as to amount to his or her disqualification—those which show that he or she is unfit for service or unfit to be trusted aboard the vessel. Willful disobedience of lawful, reasonable, necessary orders, or, as sometimes stated, incorrigible disobedience on the part of a seaman may constitute grounds for discharge, but a single act of disobedience does not necessarily constitute ground for discharge. *Trent v.*

---

differences and to drive them to more unyielding positions, whereas softer methods of resolving their dispute might bring them together").

**9.** *See* D. Pope, *At 12 Mr. Byng Was Shot* 112–132 (1962).

**10.** The famous incident where Admiral Nelson put his blind eye to the telescope and thus failed to see Admiral Parker's recall signal, with the result that Nelson's squadron pressed on to defeat the Danish fleet off Copenhagen, is recounted in *Beeler v. Downey*, 387 Mass. 609, 615 n. 6, 442 N.E.2d 19 (1982). More detailed accounts are found in IV *Dispatches and Letters of Lord Nelson* 308–09 (Nicholas ed. 1847); G. Marcus, *The Age of Nelson* 184–85 (1971); O. Warner, *Victory: The Life of Lord Nelson* 249–50 (1958); L. Kennedy, *Nelson's Captains* 250–51 (1951).

**11.** C. Nordhoff & J. Hall, *Mutiny on the Bounty* (1933). Long acknowledged to be a superb navigator and expert ship handler, *see* C. Nordhoff & J. Hall, *Men Against the Sea* (1934), Captain Bligh's reputation as an human being and naval commander has, in recent years, been somewhat resuscitated by Richard Hough's *Captain Bligh and Mr. Christian* (1973). Compare also the portrayal of Bligh by Charles Laughton in the 1935 movie version of *Mutiny on the Bounty* with that of Anthony Hopkins in *Bounty* (1984).

**12.** H. Wouk, *The Caine Mutiny* (1951).

**13.** H. Pemsel, *A History of War at Sea* 80 (1977); *Sea Power* 120–23 (E. Potter & C. Nimitz ed. 1960); M. Lewis, *The Navy of Britain* 551–54 (1948).

*Gulf Pacific Lines,* 42 F.2d 903, 904 (S.D. Tex.1930) (seaman can't be discharged for disobedience in a minor matter); *Marsland v. The Yosemite,* 18 F. 331, 333 (S.D.N.Y. 1883) (a single act of disobedience is not sufficient for discharge); *Boutin v. Sword Line Inc.,* 205. Misc. 651, 129 N.Y.S.2d 191 (1954).

■ Applying these standards to the case at bar, this Court is constrained to rule that the discharges of Fred and Debbie Stetson were improper. In the case of Debbie Stetson, there were no such specific improprieties or transgressions of rules laid down by the ship owner as would constitute grounds for her discharge. A much closer question is presented, however, by the dismissal of Fred Stetson.

The master, too, may be dismissed at any time and be replaced at the order of the ship owner. The ship owner has the right and power to discharge the master in order to reclaim possession of the ship and this right has been said to rest upon reasons of public policy particularly applicable to ships in maritime commerce. The dismissal of the master by the owner may be without cause and even in violation of his contract with the owner. However, the master has his legal rights for damages as a result of such discharge.

1 M. Norris, *The Law of Seamen* § 21.2, at 607 (4th ed. 1985) (citing *The Calypso,* 230 F. 962, 145 C.C.A. 156 [1916]).

■ In his case, there was the specific transgression of the direct order to remove the ship's cat from the ship. Moreover, it would appear that the ship owner ought have a freer hand to discharge a master should his conduct not come up to the standard of smartness, seaworthiness, and safety required by the owner. All three could well suffer if a master could successfully bring an action for damages even though he might have allowed his vessel to deteriorate into a state of slovenliness, and marginal readiness and seaworthiness. Under all the facts and circumstances of this case, however, the retention of the ship's cat contrary to orders seems an inadequate ground to warrent the skipper's discharge. Of course, no one suggests that this was Kunkel's only reason for the discharge although, as previously stated, upon the facts found by the Court, this is the only direct and express violation of the shipowner's orders. Therefore, in light of the generality of the shipowner's requirements, the inadequacy of the proof that Fred Stetson violated those requirements, and the convincing evidence that a significant motivating force behind the discharge was the economic need to cut back on personnel, this Court rules that the discharge of Fred Stetson was without proper cause under his contract.

But analysis cannot end here. Following their wrongful discharge, the Stetson's immediately contacted counsel and he moved quickly to cause the SEA CLOUD to be arrested pursuant to Federal Supplemental Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims. Counsel for the vessel moved with equal alacrity and, on June 28, 1985, acting "on behalf of my client SEA CLOUD, Inc.," forwarded a letter to the Stetsons' counsel informing him "that Fred Stetson and Debbie Stetson are still on the payroll of Sea Cloud, Inc. until the end of June, 1985." Defense counsel's letter continued: "My client wishes to inform you, as attorney for the Stetsons, and Fred and Debbie Stetson, individually, that they intend to offer Fred and Debbie Stetson continued employment until the end of November, 1985 at the present rate of pay." The Stetsons refused this offer.[14]

■ As at common law, one who seeks to claim the benefit of a bargain in the admiralty courts, must exercise reasonable efforts to mitigate damages. *Smith v. Atlas Off-Shore Boat Service, Inc.,* 653 F.2d 1057, 1064 (5th Cir.1981). Counsel for the defendant vessel here argues that the offer of continued employment at the same rate of pay ought reasonably have been accept-

---

**14.** The Stetsons argue that it was Kunkel who reneged on the offer of re-employment but the Court finds to the contrary.

ed by the Stetsons and, when they failed to accept this offer, they unreasonably failed to mitigate their damages thus preventing recovery herein.

■ This result is not self evident. First, it is not entirely clear that the letter of June 28, 1985 was an actual offer of continued employment in view of the language that states that the principals "intend to offer Fred and Debbie Stetson continued employment." The conduct of the parties themselves and the uncontradicted evidence before the Court convinces it, however, that an actual offer was made to the Stetsons. Second, it ought be noted that the offer came not from the original contracting party, Pilot Marine Services, Inc. but from Sea Cloud, Inc., the Subchapter S corporation which actually owned the SEA CLOUD. The Court concludes that this distinction has no legal significance in the circumstances. Most important, the Stetsons argue that, in view of Kunkle wrongfully discharging them and putting them on the beach in Falmouth, Massachusetts far from their vessel and its home port in Charlotte Amalie, St. Thomas, United States Virgin Islands, it was not unreasonable for them to decline again to enter the service of a shipowner who had acted so unreasonably.

This is the second extremely close question presented in this action. An employment relationship is a two way street. When an employer has breached the solemn convenants of an employment contract, the status quo ante cannot simply be restored by returning the employee to the payroll. A residue of mistrust must necessarily remain, especially here where the employees enjoy skilled and responsible positions and an employer-employee rapport is necessary for the safe and enjoyable operation of an ocean going vessel. At the same time, it hardly seems just to award the Stetsons a salary for doing nothing when an offer of gainful employment for which they are both well suited is outstanding and will mitigate the greater portion of their damages.

■ In this case, for a variety of considerations the balance tips ever so slightly against the Stetsons. First, there is no evidence that the offer was made in bad faith or that Kunkel would have, over the remainder of the contract, subjected the Stetsons to any further dislocation or inconvenience. Instead, when properly advised by counsel, the ship owner appears to have recognized its duty and agreed to assume it in full.[15] Moreover, ruling that the offer here is a reasonable way to mitigate damages facilitates prompt settlement without the transaction costs attendant upon protracted litigation. Finally, the prompt offer to re-hire Fred and Debbie Stetson constitutes independent evidence of their marketability in the ship charter business, from which evidence the Court can conclude that they could readily have obtained other berths had they so chosen.

■ Accordingly, Fred and Debbie Stetson cannot recover from the SEA CLOUD the salary which would have been paid them had they chosen to re-enter its service until the end of their year's contract. They are, however, entitled to recover the value of lost food and quarters which they would otherwise have received from the date of discharge, June 21, 1985, until the date of the offer of re-employment, June 28, 1985, the reasonable value of which comes to $200.00 for the period of seven days. They are also entitled to recover the reasonable value of transportation from the point at which they were wrongfully discharged to their home port in the United States Virgin Islands, which sum the Court concludes approximates $1,500.00. Finally, Fred Stetson is entitled to recover $720.09 as reimbursement of expenses advance by him for the benefit of the SEA CLOUD.

Judgment shall thus enter against the S/V SEA CLOUD, O.N. 679463, her engines, tackle, etc., in the aggregate amount of $2,420.09, which judgment shall be paid

---

**15.** The result here would be different were there any evidence whatsoever that this offer was a pretext or that Kunkel or others intended to beach the Stetsons again once the SEA CLOUD was released from arrest.

in accordance with the letter of undertaking by the shipowners.